**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNIQUE GAINES,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA,<br><br>Defendant. | CIVIL ACTION<br><br>No. 2:26-cv-07956<br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff Unique Gaines, by and through her undersigned counsel, hereby files this Complaint against Defendant City of Philadelphia, and in support thereof avers as follows:

### Preliminary Statement

1. Plaintiff Unique Gaines ("Plaintiff" or "Ms. Gaines") brings this action against Defendant City of Philadelphia (the "City") for sex discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. (the "PHRA").

2. Ms. Gaines, a Juvenile Detention Counselor at the City's Philadelphia Juvenile Justice Services Center ("PJJSC"), reported that two of her supervisors sexually harassed her. The City's own Human Resources investigation substantiated her complaint on October 3, 2025. Sixteen days later, on a Sunday, the City terminated her employment through a "Rejection Notice During Probationary Period" authored by a shift manager who was a friend of one of the harassers, who had told Ms. Gaines that it was wrong for her to complain, and who was himself the subject of her pending complaint.

## The Parties

3. Plaintiff Unique Gaines is an adult female who resides in Darby, Delaware County, Pennsylvania.

4. Defendant City of Philadelphia is a city of the first class and a political subdivision of the Commonwealth of Pennsylvania, which may be served through the City of Philadelphia Law Department, 1515 Arch Street, 17th Floor, Philadelphia, Pennsylvania 19102.

5. The City, through its Department of Human Services ("DHS"), operates the PJJSC at 91 North 48th Street, Philadelphia, Pennsylvania 19139, where Ms. Gaines worked.

6. At all relevant times, the City employed more than 500 employees and was an "employer" within the meaning of 42 U.S.C. § 2000e(b) and 43 P.S. § 954(b).

7. At all relevant times, Ms. Gaines was an "employee" of the City within the meaning of 42 U.S.C. § 2000e(f) and 43 P.S. § 954(c).

8. At all relevant times, the City acted through its agents, servants, and employees, including supervisors Michael Hardy, Donnie Graham, and Gregory Alexander, each of whom acted within the course and scope of his employment and with authority delegated by the City.

## Jurisdiction and Venue

9. This Court has subject-matter jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. § 2000e-5(f)(3).

10. This Court has supplemental jurisdiction over Plaintiff's PHRA claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as her Title VII claims and form part of the same case or controversy.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the City resides in this District, the unlawful employment practices alleged herein

were committed in this District, and the relevant employment records are maintained in this District.

## Administrative Exhaustion

12. On or about October 31, 2025, Ms. Gaines filed a verified Charge of Discrimination against the City with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 530-2026-00808, which she requested be dual-filed with the Pennsylvania Human Relations Commission ("PHRC"). A true and correct copy of the Charge is attached as Exhibit A.

13. The Charge alleged that the City discriminated against Ms. Gaines because of her sex and terminated her employment in furtherance of discrimination and retaliation.

14. On October 7, 2026, the EEOC issued Ms. Gaines a Determination and Notice of Rights. A true and correct copy is attached as Exhibit B. Ms. Gaines has filed this action within ninety days of her receipt of that Notice.

15. More than one year has elapsed since Ms. Gaines's Charge was dual-filed with the PHRC, and Ms. Gaines has therefore exhausted her administrative remedies under the PHRA.

16. All conditions precedent to the institution of this action have been satisfied, waived, or excused.

## Factual Allegations

### A. Unique Gaines's Employment.

17. The City hired Ms. Gaines on or about March 31, 2025, as a Juvenile Detention Counselor assigned to the PJJSC.

18. Ms. Gaines's duties included supervising and supporting youth detained at the PJJSC and helping them work toward positive life changes and reduced involvement with the juvenile justice system.

19. Ms. Gaines performed her job satisfactorily. On or about September 30, 2025, after approximately six months of service, she advanced to the position of Juvenile Detention Counselor 1.

20. Upon information and belief, before October 2025 Ms. Gaines had received no written warning or formal discipline from the City.

21. At the time of her termination, Ms. Gaines earned an annual salary of approximately $50,943, plus shift differentials and benefits.

**B. <u>Sexual Harassment by Two Supervisors and Ms. Gaines's Complaint.</u>**

22. During her employment at the PJJSC, Ms. Gaines was subjected to sexual harassment by two of her supervisors, Michael Hardy and Donnie Graham.

23. On April 15, 2025, during Ms. Gaines's training, Supervisor and Training Instructor Michael Hardy pulled Ms. Gaines into the sally port door area that leads to the supervisor's office and said in her ear he had some things to tell her that he did not want anyone to hear.

24. Michael Hardy said to Ms. Gaines, among other things, that it was hard for him to not grab on her and smack her ass; that he liked her; and, that he was trying his hardest not to look at her but he cannot help himself.

25. Michael Hardy continued throughout the training to make suggestive statements in front of others, including that he was having marital problems, that being married does not necessarily mean he is celibate, and that in a related context he almost lost his job.

26. Supervisor Donnie Graham, among other things, referred to Ms. Gaines as "baby girl" and found Ms. Gaines phone number from work papers and messaged her late at night and made statements including that despite being a married man "I still check the temperature tho, if it's the right smoke I might entertain."

27. The conduct of Mr. Hardy and Mr. Graham was unwelcome, was directed at Ms. Gaines because of her sex, and altered the conditions of Ms. Gaines's employment.

28. Mr. Hardy and Mr. Graham were Ms. Gaines's supervisors and had authority to make material decisions over her employment, including direct her daily work activities.

29. Ms. Gaines reported the sexual harassment by Mr. Hardy and Mr. Graham to Human Resources. In doing so, she opposed conduct that she reasonably and in good faith believed was unlawful under Title VII and the PHRA.

30. The City's DHS Human Resources unit opened an investigation into Ms. Gaines's complaint, and Ms. Gaines participated in that investigation.

31. On October 3, 2025, Theresa M. Wells, the City's Senior Departmental Human Resources Associate, issued a memorandum to Ms. Gaines stating that the investigation into her allegations of sexual harassment were substantiated, that there was evidence that Mr. Hardy and Mr. Graham violated policies related to the City's Sexual Harassment Prevention Policy, and that the investigation report and recommendation had been forwarded to Ms. Gaines's leadership team. A true and correct copy of the memorandum is attached as Exhibit C.

### C. The City Reassigns Ms. Gaines but Her Complaint Becomes Widely Known.

32. Ms. Gaines's complaint became widely known among co-workers and supervisors at the PJJSC.

33. On or about July 14, 2025, rather than separating the accused supervisors from Ms. Gaines, the City transferred or reassigned Ms. Gaines out of the PJJSC to a different DHS location.

34. The DHS assignment resulted in less pay and materially different job duties and, upon information and belief, delayed the completion of Ms. Gaines's probationary period.

35. Around August of 2025, the City returned Ms. Gaines to the PJJSC.

**D. <u>Shift Manager Gregory Alexander Criticizes Ms. Gaines for Complaining.</u>**

36. When Ms. Gaines returned to the PJJSC, she worked under shift manager Gregory Alexander.

37. Upon information and belief, Mr. Alexander is a friend of Mr. Hardy, knew of Ms. Gaines's complaints and the investigation, and he was compelled, coerced, and/or otherwise motivated to take adverse actions against Ms. Gaines in furtherance of discrimination and/or retaliation.

38. For example, Mr. Alexander told Ms. Gaines it was wrong for her to complain about Mr. Hardy.

39. Ms. Gaines complained to DHS Deputy Commissioner Gary D. Williams about Mr. Alexander's comment(s) and told Deputy Commissioner Mr. Williams that she felt unsafe and harassed by Mr. Alexander, including at a meeting on or about September 9, 2025.

40. A meeting among Ms. Gaines, Mr. Alexander, and Deputy Commissioner Mr. Williams was scheduled to address Ms. Gaines's complaint but the City terminated Ms. Gaines beforehand.

**E. <u>A Co-Worker Taunts Ms. Gaines About Her Complaint and Mr. Alexander Confines Her.</u>**

41. On October 2, 2025, shortly after the start of Ms. Gaines's shift, a co-worker, Juvenile Detention Counselor Ms. Wilson, confronted Ms. Gaines.

42. Ms. Wilson used profanities and called Ms. Gaines a "snitch," said that Ms. Gaines had "told on Hardy," and told Ms. Gaines that people at work disliked her because of her sexual harassment complaint.

43. Ms. Gaines sought a supervisor's involvement and Counselor Supervisor D. Wheeler brought Ms. Gaines to the unit's enclosed patio to talk, but Ms. Wilson followed them to the patio and continued the confrontation.

44. Upset and crying, Ms. Gaines telephoned Mr. Alexander to ask permission for a brief break from work to compose herself but Mr. Alexander refused and said he was on his way.

45. Ms. Gaines told supervisors while they waited that she was uncomfortable with Mr. Alexander because she had a matter and an upcoming meeting scheduled about that matter.

46. On the patio, Mr. Alexander denied Ms. Gaines's second request for a break, denied her request to speak with someone in higher authority, and told Ms. Gaines that she would stay and listen to him with regard to the matter.

47. The patio door locks and can be opened only by key or remote control and Mr. Alexander had also denied or refused Ms. Gaines's request to leave the patio.

48. Mr. Alexander moved about the patio seemingly blocking her exit and moved closer to Ms. Gaines until he was inches away.

49. Frightened and feeling trapped, Ms. Gaines raised her voice, demanded that Mr. Alexander get out of her face and let her out, and banged on the door for help until another supervisor opened it. Ms. Gaines did not strike, push, or physically harm anyone.

50. Mr. Alexander then told Ms. Gaines to clock out and leave.

51. As Ms. Gaines was being escorted by another supervisor out of the building, Mr. Alexander followed and taunted her that she was mad, that this was why she was going to be fired, and that he was going to the deputy so that she would no longer work there.

52. At the front of the building, Supervisor Corrine Stokes confirmed with another supervisor that Mr. Alexander had directed Ms. Gaines to clock out and leave, and then instructed Ms. Gaines to clock out, go home, and call the facility later.

53. That evening, a PJJSC supervisor told Ms. Gaines that everything was fine and that she should return to work at her regular time the next day.

### F. The City Terminates Ms. Gaines Sixteen (16) Days After Substantiating Her Complaint of "Sexual Harassment."

54. Ms. Gaines returned to work the next day and continued to work through October 17, 2025, performing duties away from residents while the City purportedly investigated the events of October 2.

55. On October 3, 2025, the day after the patio incident, the City notified Ms. Gaines that her sexual harassment complaint against Mr. Hardy and Mr. Graham was substantiated.

56. On or about October 4 and October 6, 2025, Ms. Gaines contacted Ms. Wells in Human Resources and Deputy Commissioner Gary D. Williams to again report Mr. Alexander's conduct, including his confinement of her on October 2.

57. Mr. Alexander, although a direct participant in the events of October 2 and the subject of Ms. Gaines's pending complaint, prepared and signed a "Rejection Notice During Probationary Period" and accompanying narrative recommending Ms. Gaines's employment end.

58. The Rejection Notice asserted that Ms. Gaines violated the DHS Workplace Violence Policy, the Commissioner's Policy on Workplace Conduct, and attendance rules ("AWOL"), based on the events of October 2, 2025.

59. The AWOL charge was based on Ms. Gaines leaving the facility on October 2, which Mr. Alexander himself had directed, and Supervisor Stokes approved.

60. The narrative's account of October 2 was written by Mr. Alexander, a participant in the dispute, and relied in part on surveillance video that has no audio.

61. The approval line of the Rejection Notice is dated October 14, 2025, a day before the October 15, 2025 date beside Mr. Alexander's signature. The Deputy Human Resources Director's consent is dated October 16, 2025.

62. Upon information and belief, the Rejection Notice was approved by an official who was outside Ms. Gaines's ordinary chain of command and unfamiliar with the matter, bypassing Deputy Commissioner Mr. Williams, who was then handling Ms. Gaines's complaint about Mr. Alexander.

63. Upon information and belief, Deputy Commissioner Mr. Williams later viewed the termination as wrongful and attempted to return Ms. Gaines to work.

64. The Rejection Notice listed the last day of Ms. Gaines's probationary period as March 29, 2026, nearly one year after her hire. The City invoked probationary status to end Ms. Gaines's employment without warning, progressive discipline, a hearing, or union representation, protections that Ms. Gaines understood she had earned upon completing her initial six months of service.

65. On Sunday, October 19, 2025, the City served the Rejection Notice on Ms. Gaines and terminated her employment effective that day.

66. Upon information and belief, the City did not terminate or discipline Ms. Wilson, who initiated the October 2 confrontation, directed profanity at Ms. Gaines, and taunted her about her sexual harassment complaint in front of residents.

67. Upon information and belief, the City did not discipline Mr. Alexander for confining Ms. Gaines on the patio or for taunting her that she would be fired.

68. The City terminated Ms. Gaines sixteen days after its Human Resources unit substantiated her sexual harassment complaint and within approximately two weeks of her complaints to Human Resources and Deputy Commissioner Mr. Williams about Mr. Alexander.

69. The reasons the City gave for terminating Ms. Gaines are false and a pretext. The City terminated Ms. Gaines because she complained of sexual harassment and opposed retaliation, and because of her sex.

70. On information and belief, the City replaced Ms. Gaines with a male employee.

71. As a direct and proximate result of the City's conduct, Ms. Gaines has suffered and continues to suffer lost wages and benefits, loss of earning capacity, emotional distress, humiliation, anxiety, damage to her professional reputation, and other economic and non-economic harm.

## COUNT I
## Title VII — Sex Discrimination and Hostile Work Environment
## 42 U.S.C. § 2000e-2(a)

72. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

73. Title VII makes it unlawful for an employer to discharge an employee, or otherwise to discriminate against her with respect to the terms, conditions, or privileges of employment, because of her sex. 42 U.S.C. § 2000e-2(a)(1).

74. Mr. Hardy and Mr. Graham subjected Ms. Gaines to unwelcome sexual harassment because of her sex that was severe or pervasive, that detrimentally affected her, and that would detrimentally affect a reasonable person in her position.

75. The City is liable for the harassment because Mr. Hardy and Mr. Graham were Ms. Gaines's supervisors, and because the City knew or should have known of the harassment and failed to take prompt and appropriate remedial action, instead reassigning Ms. Gaines to less

desirable work and returning her to a workplace where she was ostracized and punished for complaining.

76. The City further discriminated against Ms. Gaines because of her sex by terminating her employment while failing to discipline Ms. Wilson and Mr. Alexander for their conduct on October 2, 2025.

77. As a result of the City's violations of Title VII, Ms. Gaines has suffered the damages described above and is entitled to the relief set forth below.

**COUNT II**
**Title VII — Retaliation**
**42 U.S.C. § 2000e-3(a)**

78. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

79. Title VII makes it unlawful for an employer to discriminate against an employee because she has opposed a practice made unlawful by Title VII or has participated in an investigation under Title VII. 42 U.S.C. § 2000e-3(a).

80. Ms. Gaines engaged in protected activity by, among other things, complaining of sexual harassment by Mr. Hardy and Mr. Graham, participating in the City's investigation of that complaint, and complaining to Deputy Commissioner Williams and Human Resources that Mr. Alexander criticized, harassed, and confined her because she had complained.

81. The City took materially adverse actions against Ms. Gaines that would dissuade a reasonable worker from making or supporting a charge of discrimination, including reassigning her to a lower-paying position with different duties, subjecting her to retaliatory harassment by her shift manager and co-workers of which the City knew and which it failed to stop, confining her on October 2, 2025, and terminating her employment.

82. There is a causal connection between Ms. Gaines's protected activity and the adverse actions, as shown by, among other things, the close timing between her complaints and

the adverse actions, Mr. Alexander's statement that it was wrong for her to complain about Mr. Hardy, his threats that she would be fired, his role in authoring the Rejection Notice despite his conflict, and the pretextual nature of the City's stated reasons.

83. As a result of the City's violations of Title VII, Ms. Gaines has suffered the damages described above and is entitled to the relief set forth below.

**COUNT III**
**PHRA — Sex Discrimination and Hostile Work Environment**
**43 P.S. § 955(a)**

84. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

85. The PHRA makes it an unlawful discriminatory practice for an employer, because of an individual's sex, to discharge her or otherwise to discriminate against her with respect to compensation, tenure, terms, conditions, or privileges of employment. 43 P.S. § 955(a).

86. For the reasons set forth in Count I, the City subjected Ms. Gaines to a hostile work environment because of her sex and discriminated against her because of her sex, in violation of the PHRA.

87. As a result of the City's violations of the PHRA, Ms. Gaines has suffered the damages described above and is entitled to the relief set forth below.

**COUNT IV**
**PHRA — Retaliation**
**43 P.S. § 955(d)**

88. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

89. The PHRA makes it an unlawful discriminatory practice for an employer to discriminate in any manner against an individual because she has opposed any practice forbidden by the PHRA or has participated in an investigation or proceeding under it. 43 P.S. § 955(d).

90. For the reasons set forth in Count II, the City retaliated against Ms. Gaines because she opposed sexual harassment and participated in the City's investigation of it, in violation of the PHRA.

91. As a result of the City's violations of the PHRA, Ms. Gaines has suffered the damages described above and is entitled to the relief set forth below.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff Unique Gaines respectfully requests that this Court enter judgment in her favor and against Defendant City of Philadelphia on all Counts and award the following relief:

(a) A declaration that the City's conduct violated Title VII and the PHRA;

(b) Reinstatement to Ms. Gaines's position with full seniority and benefits or, in the alternative, front pay;

(c) Back pay, lost benefits, and other lost compensation, with prejudgment interest;

(d) Compensatory damages for emotional distress, humiliation, mental anguish, reputational harm, and other non-pecuniary losses, as permitted by 42 U.S.C. § 1981a and the PHRA;

(e) Removal of the Rejection Notice and all references to the October 2025 termination from Ms. Gaines's personnel file;

(f) An injunction prohibiting further retaliation against Ms. Gaines;

(g) An additional amount to offset any adverse tax consequences of a lump-sum award;

(h) Reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 2000e-5(k) and 43 P.S. § 962(c.2);

(i) Pre- and post-judgment interest; and

(j) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

DERECK SMITH LAW GROUP, PLLC

By: */s/ Christopher J. DelGaizo, Esquire*
Christopher J. DelGaizo, Esquire
PA Attorney I.D. No. 200594

1628 Pine Street
Philadelphia, PA 19103
Tel.: (215) 391-4790
Fax: (215) 501-5911
Cell: (610) 844-1779
Email: Chris@dereksmithlaw.com
*Attorneys for Plaintiff, Unique Gaines*

Dated: October 16, 2026

**Exhibits:**

A — EEOC Charge of Discrimination No. 530-2026-00808 (Oct. 31, 2025)
B — EEOC Determination and Notice of Rights (Oct. 7, 2026)
C — City of Philadelphia DHS Memorandum re: Investigation Results (Oct. 3, 2025)